**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRANDON ALEJANDRO YANCEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 10836 |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Brandon Alejandro Yancey ("Mr. Yancey"), has filed a motion for summary judgment and memorandum in support seeking reversal or remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying Mr. Yancey's application for Supplemental Security Income Benefits ("SSI") (doc. #13: Pl.'s Mot. for Summ. J.) (doc. # 14: Pl.'s Br. in Supp. of Reversing the Decision of the Comm'r of Soc. Sec. ("Pl.'s Mem.")). The Commissioner filed a response seeking affirmance of the decision denying benefits (doc. # 21: Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem.")). Mr. Yancey also filed a reply (doc. # 22: Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Summ. J.). For the following reasons, we grant Mr. Yancey's motion for summary judgment and deny the Commissioner's motion to affirm.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On January 27, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 10).

## I.

Mr. Yancey applied for benefits on November 21, 2012, alleging he became disabled on October 19, 2012 (R. 183) due to Post Traumatic Stress Disorder ("PTSD") and asthma (R. 104). His claim was denied initially on April 26, 2013, and upon reconsideration on November 13, 2013 (R. 15, 114, 129). Upon timely request, a hearing was held before an Administrative Law Judge ("ALJ") on April 14, 2015 (R. 15, 35, 144). The ALJ issued a decision on May 20, 2015, finding that Mr. Yancey was not disabled (R. 12-32). The Appeals Council then denied Mr. Yancey's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-6). *See* 20 C.F.R. § 404.981; *Loveless v. Colvin*, 810 F. 3d 502, 506 (7th Cir. 2016).

## II.

Mr. Yancey was born July 27, 1992, and alleges he became disabled on October 19, 2012, at the age of 20 (R. 183). He attended school through the eleventh grade (R. 41-42, 44). In April 2011, Mr. Yancey entered a gas station bearing a firearm; upon entering, he saw several police officers and ran away (R. 45-46). The police shot Mr. Yancey in the upper right thigh; he was treated at Advocate Christ Medical Center, arrested and discharged to prison (R. 46, 47, 322). Mr. Yancey later plead guilty to unlawful use of weapons, aggravated assault of an officer with a firearm and aggravated unlawful use of a weapon; he spent approximately six months in prison, and was released on October 25, 2011 (R. 47); *see also In re Brandon A. Yancey*, Docket No. 2011CR0701601 (Ill. Cir. Ct. May 6, 2011).

The medical record shows that on April 9, 2011, Mr. Yancey was treated at Advocate Christ Medical Center for a gunshot wound to the right upper thigh (R. 322-331). Computerized tomography showed a gunshot wound to the right thigh with bullet trajectory along the right

anterior lateral thigh coursing inferiorly and posterior to the right medial posterior thigh (*Id.*). The general diagnostic test failed to demonstrate evidence of fracture or destructive change (*Id.*).

Mr. Yancey was seen at Cermak Health Services of Cook County's Emergency Room on April 12, 14, and 17, 2011, to receive treatment for an infection at the site of the gunshot wound (R. 336-51). Mr. Yancey continued with the plan of care from April 12, 2011 through September 30, 2011, as reflected in the Progress Note Input from Cook County Health and Hospital System (R. 352-386). He was hospitalized from May 4 to May 7, 2011 at John H. Stroger, Jr. Hospital of Cook County due to pain and an infection at the site of the wound (R. 409). Mr. Yancey was diagnosed with deep vein thrombosis in his right lower extremity and was placed on Coumadin and then Warfarin from April 2011 through October 2011 (R. 406, 413).

Approximately one year later, on October 18, 2012, Mr. Yancey underwent a psychiatric diagnostic assessment by Royce J. Lee, M.D. of the University of Chicago Medicine, on a referral from his primary care physician, Sachin Dilip Shah, M.D., for having "visions of the trauma" (R. 423, 430). Mr. Yancey reported to Dr. Lee that when he was released from prison in October, 2011, he was unable to resume his life (R. 424). He reported a depressed mood, feeling down and sad, difficulty falling asleep every other night, decreased appetite with weight loss, decreased concentration and motivation, feeling guilty about the day he was shot in his thigh and feeling hopeless that he will get better (*Id.*). Mr. Yancey also reported hearing voices intermittently after the injury but denied other delusions and denied obsessive thoughts and compulsions (*Id.*). He reported having nightmares and frequent dreams about the shooting, flashbacks, and feeling afraid, hot, scared and paranoid (*Id.*). Mr. Yancey reported decreased concentration and intermittent irritability, but denied a history of anxiety or panic attacks (*Id.*).

Dr. Lee diagnosed Mr. Yancey with major depressive disorder, single episode, severe, specified as with psychotic behavior and post-traumatic stress disorder (R. 423). In Dr. Lee's initial treatment plan and recommendations, he recommended that Mr. Yancey start on a small dose of Paxil for depression and post-traumatic stress disorder, that he would benefit from psychotherapy, and that Mr. Yancey should see him in two to three weeks (R. 430).

Dr. Lee next saw Mr. Yancey on November 1, 2012 (R. 432). Mr. Yancey stated that he did not get his medication until a week prior to the appointment but he reported taking it (*Id.*). He reported his mood as irritable; that he had been easily getting angry at his mother, with whom he lived, but was trying to stay in control; and that he was trying not to react in anger (*Id.*). Mr. Yancey stated that during the last several days he had not heard any voices, and denied any paranoid thinking (*Id.*). Mr. Yancey stated that he was sleeping 12 hours per day, was feeling otherwise mellow and relaxed, and that he was looking for a job (*Id.*). Dr. Lee's treatment plan for Mr. Yancey was to continue the current dosage of Paxil and to start him on the medication Risperidone (R. 436).

At Mr. Yancey's next appointment with Dr. Lee on November 15, 2012, Mr. Yancey reported that he took his medications regularly and denied side effects (R. 437). He had low motivation but reported "good energy and appetite" and denied psychotic symptoms (*Id.*). Mr. Yancey stated that he had not heard voices since being on Risperdal,[3] his biggest change was a decrease in irritability, and he was arguing with his mother less frequently although he continued to have nightmares three times a week (*Id.*). In the treatment plan, Dr. Lee described Mr. Yancey's progress as "improved," and recommended continuing the same medications as they were helping Mr. Yancey sleep and were alleviating his psychotic symptoms (R. 441).

---

[3] The treatment notes interchanged the names of Mr. Yancey's medications as "Paxil" with "paroxetine" and "risperdal" with "risperidone" (R. 437).

On November 16, 2012, Mr. Yancey complained to his primary care physician, Dr. Shah, that he had muscle tightness in his posterior legs bilaterally but no swelling (R. 413). He also reported that his symptoms were worse with weather changes like rain and he experienced numbness/tingling in the sole of his right foot (*Id.*). Mr. Yancey had no weakness, balance issues, or falls (*Id.*). His musculoskeletal physical exam showed a normal range of motion and no edema (R. 415). Mr. Yancey also had no neurological deficits (R. 415).

On November 28, 2012, Mr. Yancey started psychotherapy with Andrea C. King, PhD, of the University of Chicago Medicine (R. 442). Dr. King diagnosed Mr. Yancey with major depressive disorder, recurrent episode, unspecified (*Id.*). Dr. King assessed him as presenting with "Interpersonal Problems and Hallucinations" (R. 446). In her treatment plan, Dr. King noted that Mr. Yancey had physical and mental disabilities that predated, but were exacerbated by, the shooting and the time he spent incarcerated (*Id.*). Mr. Yancey denied he was involved in any wrongdoing when he was shot by a police officer and "wanted [the] police to give him a financial settlement" (*Id.*). He also wanted to "get SSI and live off that money;" he had "no real desire to complete GED or obtain a job;" he also wanted to get along better with his mother (*Id.*). Continuing with her treatment plan, Dr. King stated that Mr. Yancey was "isolated" and "withdrawn with little psychological insight" (*Id.*). Dr. King worked with Mr. Yancey on stress reduction and communication skills and they practiced deep breathing, time out and thinking through impulses (*Id.*).

Dr. King saw Mr. Yancey again on December 14, 2012, where he reported fewer arguments with his mother and none in the past two weeks that were aggressive (R. 447). They worked on processing the events of the shooting, and Dr. King noted that Mr. Yancey was

fixated on getting compensation from the Chicago Police Department or getting on disability (*Id.*). Dr. King tried to motivate Mr. Yancey to begin a job training program (*Id.*).

On December 20, 2012, Mr. Yancey met with Dr. Lee again (R. 447). Mr. Yancey reported taking all of his medications, that his mood was a "little better," he felt "less irritable," and was arguing less frequently with his mother (R. 448). Mr. Yancey also denied anxiety and denied hearing voices since he was started on medications (*Id.*). Mr. Yancey denied paranoid thinking, but had some "vague magical thinking" (*Id.*). The treatment plan called for Mr. Yancey to continue his current medications and to pick up his refill of Risperdal; Mr. Yancey admitted he had not been taking that medication for a few days (R. 452). Additionally, Dr. Lee prescribed Paroxetine, and advised Mr. Yancey to continue his psychotherapy sessions, to join Job Corps and to bring his mother to the next appointment (*Id.*). Mr. Yancey's progress was described as somewhat improved (R. 453).

Mr. Yancey's next psychotherapy appointment with Dr. King occurred on December 21, 2012 (R. 453). For the second week in a row, Mr. Yancey denied symptoms of post-traumatic stress disorder or thought disorder, and said the arguments with his mother were mild to moderate but not as aggressive or impulsive as they had been in the past few months (*Id.*). During the session, Dr. King and Mr. Yancey called to obtain information about the Job Corps, and were informed that Mr. Yancey could attend the orientation session within the next few weeks (*Id.*). On January 3, 2013 at the next psychotherapy session with Dr. King, Mr. Yancey reported no major problems in the previous two weeks except the usual altercations and verbal arguments with his mother (R. 453-54).

On January 24, 2013, Mr. Yancey attended his appointment with Dr. Lee, and reported that he was sleeping well and was not disturbed by nightmares (R. 455). Mr. Yancey reported

that he could not concentrate for lengthy periods of time but that his energy, motivation and appetite were "okay" (*Id.*). He reported feeling suicidal when he argued with his mother, but he would never act on it (*Id.*). Mr. Yancey also moved out of his mother's home and was living with his girlfriend (*Id.*). At first, he reported he was not hearing voices, but then he told Dr. Lee he was hearing voices and they came when he was upset with his mom, although he thought "they might just be his thoughts" (*Id.*). He also reported they were different from the times he heard voices before he was medicated (*Id.*). Mr. Yancey reported he was not feeling irritable (*Id.*). Finally, as part of his treatment plan, he was "[a]dvised on joining job corps" (R. 457).

Mr. Yancey and his mother both met with Dr. Lee on February 28, 2013 (R. 458-59). They had intense arguments during the session; Mr. Yancey yelled and had difficulty restraining himself from verbal aggression (R. 459). Dr. Lee noted that medication compliance was doubtful, and that Mr. Yancey has not seen his psychotherapist since December (*Id.*). The treatment plan was to continue Risperdal (R. 461).[4]

Ellen Rozenfeld, Psy.D, prepared a consultative examination on Mr. Yancey on April 19, 2013, concluding that claimant had a severe mental impairment that did not meet or equal the listings and that he retained the sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis (R. 109). Dr. Rozenfeld concluded that in the B criteria, Mr. Yancey's restriction of activities of daily living was mild; his difficulties in maintaining social functioning was moderate; his difficulties in maintaining concentration, persistence and pace was moderate; and he had no episodes of decompensation (R. 108). Dr. Rozenfeld determined that the extent of Mr. Yancey's limitations as described were excessive when compared to the objective evidence in the file (R. 109). She noted that Mr. Yancey reported he can pay attention for only three minutes and was unable to work due to problems concentrating; however, he

---

[4] Paroxetine was listed as a "current medication" but it was not listed in the treatment plan (R. 459, 461).

watched movies, played chess and video games, and wrote poetry (*Id.*). Additionally, Dr. Rozenfeld found that Mr. Yancey was able to go out alone, take public transportation, drive, and got along with others although he was afraid of the police (*Id.*). She assessed claimant's statements as partially credible (*Id.*). Dr. Rozenfeld also assessed his mental residual functional capacity ("RFC") as "retain[ing] the ability to perform simple repetitive tasks on a sustained basis with consideration to the limitations noted above" (R. 113). Dr. Rozenfeld determined that Mr. Yancey was not disabled (R. 114).

On July 12, 2013, Mr. Yancey saw Dr. Shah, his primary care physician (R. 573-74). Dr. Shah noted that Mr. Yancey had not seen Dr. Lee since February 2013 because he "felt he was making progress" (R. 575). Additionally, Mr. Yancey was working on obtaining his GED and hoped to resume classes soon (*Id.*).

Despite Dr. Shah's July treatment records noting Dr. Lee had not seen Mr. Yancey since February, Dr. Lee's Mental Impairment Questionnaire about Mr. Yancey dated August 22, 2013 indicated he had seen Mr. Yancey once per month for the past two years (R. 469-71, 575).[5] In the report, Dr. Lee wrote that Mr. Yancey's impairment would cause him to be absent from work about twice a month and supported his ten categories of "markedly limited" assessments of Mr. Yancey as a history of violent outbursts in social interactions, a history of markedly erratic behavior, and poor sleep that interferes with his ability to maintain a work schedule (R. 470). Dr. Lee assessed Mr. Yancey with "moderate" restrictions of activities of daily living, "marked" difficulties in maintaining social functioning, "marked" deficiencies of concentration, persistence or pace, and "repeated" episodes of deterioration or decompensation in work or work-like

---

[5] The Administrative Record, however, reflects that as of August 22, 2013, Mr. Yancey had been seen by Dr. Lee a total of only six times, on October 18, November 1 and 15, and December 20, 2012, and January 24 and February 28, 2013 (R. 423, 432, 437, 447, 454, 458). The Record does not reveal any visits by Mr. Yancey with Dr. Lee between February 28 and August 22, 2013.

settings (R. 471). Finally, Dr. Lee commented that Mr. Yancey's post-traumatic stress disorder and psychotic symptoms did not go into remission "despite ongoing treatment and are causing severe functional impairment" (*Id.*).

Roopa K. Karri, M.D., performed an internal medicine consultative examination for the Bureau of Disability Determination Services of Mr. Yancey on October 18, 2013 (R. 472). Mr. Yancey reported to Dr. Karri that he had a history of asthma, gunshot wound in the right leg, post-traumatic stress disorder and depression (R. 472). He also stated to her that he tried marijuana, had pain in the right groin for the last two to three years, has had two surgeries, was advised to exercise, does not take medications, and his hip locks up with weather changes (R. 472-73). He has had asthma since birth and it is aggravated by upper respiratory infections and exposure to smoke; he occasionally uses an inhaler (R. 473). Mr. Yancey denied any emergency room visits or hospitalizations to Dr. Karri (*Id.*). He has a driver's license, but does not drive and he can do some chores (*Id.*). Dr. Karri reported that his lungs were clear (R. 474). The musculoskeletal examination showed that Mr. Yancey was able to get on and off the exam table, could walk 50 feet without support, had a slight limp on the right leg, could tandem gait and heel/toe walk and squat (*Id.*). The range of motion of his hips was flexion 95 degrees bilaterally (*Id.*). Dr. Karri reported that Mr. Yancey's neurological exam was within normal limits, that he was alert and oriented in all three spheres and his overall effort and cooperation were excellent (*Id.*). Dr. Karri's impressions of Mr. Yancey were a history of asthma that is under control with the occasional use of an inhaler; a history of right leg gunshot wound with mildly decreased range of motion in the hip; depression and post-traumatic stress disorder; and a history of marijuana use in the past (R. 474-75).

Henry K. Fine, M.D., performed a psychiatric evaluation of Mr. Yancey on October 18, 2013 (R. 477). He reported that Mr. Yancey was either vague or denied his past psychiatric history and substance abuse, other than marijuana use and the more recent post-traumatic stress disorder (R. 480). Dr. Fine reported that the post-traumatic stress disorder was "described clearly with a somewhat positive response to medications" (*Id.*). Mr. Yancey's mental status examination showed immediate memory deficit, poor fund of information, calculation problems and problems abstracting (*Id.*). Dr. Fine also opined that Mr. Yancey could manage his own funds (*Id.*).

In a non-examining consultative examination on November 5, 2013, Thomas Low, PhD, concluded that claimant had a severe mental impairment that did not meet or equal the listings and that Mr. Yancey retained sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis (R. 123). Dr. Low opined on the "B" criteria that Mr. Yancey's restrictions of activities of daily living were mild; his difficulties in maintaining social functioning were moderate; his difficulties in maintaining concentration, persistence or pace were moderate; and he had no episodes of decompensation (R. 122). With regard to Mr. Yancey's mental RFC, Dr. Low determined that claimant had the mental capacity to concentrate on, understand and remember routine, repetitive instructions; his ability to carry out tasks with adequate persistence and pace was moderately impaired for detailed/complex tasks but adequate for completion of routine, repetitive tasks; his ability to interact with and get along with the general public, coworkers and supervisors was moderately limited but adequate for occasional contact; and his ability to handle stress was moderately reduced but adequate to tolerate routine stressors of a routine, repetitive work setting (R. 125-27). Overall, Dr. Low found that Mr.

Yancey had the mental RFC to "perform simple repetitive tasks on a sustained basis with consideration to the limitations" discussed above (R. 127).

Mr. Yancey was seen in the Emergency Room ("ER") of the University of Chicago Medicine on December 12, 2013 (R. 606). The Record does not specifically state why Mr. Yancey visited the ER, however, he was instructed to start his "new medication" and follow up with Dr. Lee for therapy (R. 608).[6]

According to the ER's Encounter Notes, Mr. Yancey visited the ER of the University of Chicago Medicine again on February 13, 2014, directly from Dr. Lee's clinic, after making homicidal threats towards his mother (R. 618). The verbal altercations with his mother escalated to physical confrontations and the Encounter Notes stated that Mr. Yancey's mother had a restraining order entered against him; however, she allowed him to live with her (Id.). Mr. Yancey reported compliance with his medication (although does not specify which one); however, the pharmacy reported he had not requested a refill since August 2013 (Id.). Mr. Yancey stated he had nightmares and flashbacks and his mood was a "6/10" (Id.). The ER Encounter Notes stated that Mr. Yancey was having "escalating confrontations with mother in context of medication noncompliance," and recommended hospitalization so they could safely restart his medications (R. 621).

On April 24, 2014, Mr. Yancey saw Dr. Lee for a medical evaluation and follow-up appointment (R. 632). He presented with aggression, depression and interpersonal problems and was taking Paroxetine and Risperdal, although he reported missing his medications once a week (Id.). Dr. Lee's progress note/treatment plan indicates that Mr. Yancey completed a partial hospitalization program at Mercy Hospital on April 2, 2014, and he was referred to Thresholds

---

[6] The "new medication" was carbamazepine, although Mr. Yancey never actually took this medication (R. 618).

(*Id.*).[7] Mr. Yancey reported to Dr. Lee that he had a thought of harming his mom after an altercation with her, but he took a walk and threw some rocks which made him feel better (*Id.*). He denied insomnia and nightmares and described his mood as "in between [happy and sad]" with no loss of interest, no change in appetite, and he had the "energy to get out and do stuff but not too much" (*Id.*). Mr. Yancey denied flashbacks and reported his anxiety "kicks in when he thinks about stuff" and he feels like an "outcast" (*Id.*). He denied drug use, and said he was no longer talking to friends but spent time with family and on the computer (*Id.*). The treatment plan included a comment that he was "stable at this time" (R. 636).

Mr. Yancey next met with Dr. Lee on September 25, 2014 (R. 637). He reported anxiety, occasional auditory hallucinations that seemed to be psychotic because they occurred outside his head and involved commentary, and feeling withdrawn and disconnected (*Id.*). Mr. Yancey reported getting along better with his mother and that he tried to work, engaging in temporary work situations (*Id.*). Another referral to Thresholds was made (*Id.*).

On November 20, 2014, Mr. Yancey reported to Dr. Lee that he had been out of his medication for several weeks (R. 640). He was living with his grandmother, explaining that he had gotten angry with his mom and kicked and broke a door in her house, but denied current thoughts of harming his mother (*Id.*). He denied insomnia and nightmares but reported flashbacks one time per week (*Id.*). The plan was to restart his medications and talk therapy was recommended (*Id.*).

When Mr. Yancey met with Dr. Lee on January 22, 2015, he complained of depression – he "wasn't feeling too good," he "was looking for more action," and he could see himself "sometimes across the room" (R. 644). He also reported "sleeping well, spending his day on the

---

[7] "Thresholds is one of the oldest and largest providers of recovery services for persons with mental illnesses and substance abuse disorders in Illinois." Thresholds, http://www.thresholds.org/about (last visited Feb. 26, 2018). The Administrative Record is devoid of any records from Thresholds.

computer on Facebook, and seeing friends" (*Id.*). Mr. Yancey stated that he was taking the medications regularly and he felt that the paroxetine helped and while he is less sure about the risperidone, on the whole he thought it also worked (*Id.*). Mr. Yancey reported that he was working on obtaining his GED, and living with his grandmother, aunt and cousin (R. 645). In his treatment plan, Mr. Yancey expressed a desire to talk about his gunshot wound and noted that a therapist agreed to take him on in therapy (R. 648). His mood was better than it had been before (*Id.*). His auditory hallucinations were very mild, and while Mr. Yancey seemed to dismiss them, they were of concern to Dr. Lee (*Id.*).

Mr. Yancey met with Philippe-Gerard Silva Tapon, M.D., on March 19, 2015 for treatment and reported he slept well but had strange dreams, smoked marijuana rarely, smoked three to four cigarettes daily, and shook on his left side and had some hypogastric pain (R. 650).[8] Mr. Yancey also stated that his temper had been "okay," his mood was best in the morning, and he had enough energy to get through the day (*Id.*). He had stopped taking risperidone, but continued to take paroxetine and he thought it worked (*Id.*). He reported that he still was working on obtaining his GED (R. 651). The treatment plan included increasing his dosage of paroxetine, resuming risperidone, and a recommendation to begin weekly psychotherapy sessions (R. 653). Mr. Yancey felt the risperidone helped make the auditory hallucinations go away, although it was noted that he had not been taking the medication because he ran out (R. 654).

Dr. Lee completed a second mental impairment questionnaire of Mr. Yancey on March 24, 2015 (R. 655-57). Dr. Lee stated that Mr. Yancey's functioning was "very low," that he was "socially withdrawn," "inappropriate," had "difficulty in relationships," and was "sometimes combative" (R. 655). He had a "partial response to medications" and his prognosis was "guarded: with successful treatment, function may improve" (*Id.*). Dr. Lee opined that Mr.

---

[8] The record is unclear as to why Mr. Yancey saw Dr. Tapon rather than Dr. Lee for this appointment.

Yancey's impairments would cause him to be absent from work more than three times a month and he had marked difficulties in areas that required social interaction and suppression of his anger and aggression (R. 656). Dr. Lee assessed Mr. Yancey with "mild" restriction in activities of daily living, "marked" difficulties in maintaining social functioning, "marked" deficiencies of concentration, persistence or pace, and "continual" episodes of deterioration or decompensation in work or work-like settings (R. 657). Dr. Lee also submitted a letter to whom it may concern dated March 24, 2015, discussing Mr. Yancey's treatment and saying that his symptoms were "severe and disabling" (R. 658).

## III.

Mr. Yancey appeared for a hearing before the ALJ on April 14, 2015 (R. 35). He testified that he lives with his grandmother, aunt, cousin, and two dogs (R. 40). He did not graduate from high school but rather left school to join the Job Corp, although he never attended it (R. 41-42, 44). Mr. Yancey had worked at the Dollar Tree as a cashier after school a few days a week (R. 43).

Mr. Yancey testified that he had a gunshot wound to his upper leg in 2011 but "forgot what happened" (R. 45). When pressed further, he testified that he was walking to the gas station, the officer tried to stop him and he ran because he had a gun in his jacket (R. 45-46). Mr. Yancey did not have a license for the weapon and he thought the police officers might have been watching or shadowing him (R. 46).

Mr. Yancey testified that he had worked for three days in shipping and receiving through a staffing network (R. 49). They called Mr. Yancey for additional work but he was "having problems working and going there and standing and doing the work" (R. 50). He also worked in 2013 shoveling snow and doing various jobs for two weeks, through Staffing Network Holdings,

cleaning off pipes, making boxes and breaking down boxes (R. 51-52). Mr. Yancey obtained these jobs through his friends and neighbors (R. 52). He also looked for work on-line (*Id.*).

Mr. Yancey testified that he spent his days waking up at 2:00 p.m. in the afternoon and going to sleep at 3:00 a.m. in the morning (R. 56). He stays home at his grandmother's house and hangs out with his cousin (*Id.*). He watches television and plays video games with his cousin from 7:00 p.m. to 3:00 a.m. (R. 57-58). He plays video games by himself from 2:00 p.m. to 7:00 p.m. and also plays with his dogs for an hour or two in the yard and in the house (R. 58-59). Mr. Yancey also watches TV with his grandmother and helps around the house by taking the garbage out, running errands, sweeping the floor, doing dishes, and cleaning the fans and mirrors (R. 60-61).

Mr. Yancey testified that he had taken medication for post-traumatic stress disorder and depression since 2012 (R. 61-63). He testified that he had stopped his medications because he did not have the money to get the medications but resumed his medications in the hospital in 2013 or 2014 (R. 65).[9] Mr. Yancey's mother has gotten his medication since his discharge from the hospital (R. 67).

When he did not take his medication, Mr. Yancey noticed that he had "more flare ups," "more visions and stuff in [his] head, telling [him] what to do" (R. 68). He also heard voices "like [he] was in the Disney movie," he was "one of the seven dwarves" (R. 68-69). His doctor increased the medications and the hallucinations stopped (R. 73). He also testified that he saw the Disney movies in his head regardless of whether he was taking the medication and not that the medication was causing it (R. 82). Mr. Yancey has also been treated for asthma but has not been hospitalized or been to the emergency room for asthma related symptoms (R. 74-75).

---

[9] Mr. Yancey's testimony does not provide a specific time period of when he stopped taking his medications.

Mr. Yancey testified that he did not enjoy doing any of his past jobs because "it made [him] tired and it caused pain" (R. 75). Standing two to three hours at one time was painful for him and he only received a break after five hours of standing (R. 76). He testified that he could not think of any type of work that he "could" perform but that he "would" like to work as a drug counselor (R. 77).

Mr. Yancey's mother, Angela Perez ("Ms. Perez"), also testified (R. 84). At the time of the hearing, Mr. Yancey had not lived with his mother for about a year (R. 85). She testified that she did not visit with claimant because she has a restraining order against him (*Id.*). She testified that Mr. Yancey lives with her mother, sister and her sister's son (*Id.*). She testified that there have been "lifelong" issues between her and Mr. Yancey due to Mr. Yancey's "oppositional defiance disorder and [her] being the only parental figure in his life" (R. 86-87). He has been "aggressive towards" her (*Id.*). She testified that oppositional defiance disorder means that Mr. Yancey has problems accepting responsibility, he is aggressive, it is hard for him to take responsibility for his actions and he consistently blames others, primarily Ms. Perez, for his faults and problems (R. 88). Ms. Perez explained that claimant had behavior problems at school too (R. 87-88). He was aggressive with others in school and with friends (R. 88).

Ms. Perez testified that after Mr. Yancey was shot by the police and incarcerated, his "psychological handicap became even more severe" (R. 89). She stated that "he became even more agitated, even more restless," and "reclusive" (*Id.*). She also testified that Mr. Yancey sometimes gets into arguments with his cousin but most of the time his living situation is "durable" (R. 91). He listens to his grandmother on occasion, a noticeable improvement, and she has a better chance of reaching him than Ms. Perez does (R. 91-92). Mr. Yancey has also asked Ms. Perez to find him a job (R. 92).

Ms. Perez has had Mr. Yancey in counseling since the age of nine (R. 92). She pays for his medication and does not believe he takes it on a regular basis (R. 93). Ms. Perez noticed that he talks to himself more since the incident with the police and that is true even while taking his medication and seeing Dr. Lee (*Id.*).

During the hearing, a vocational expert ("VE") testified that she heard the testimony and examined the exhibit file in the case (R. 96). The ALJ gave the VE a hypothetical of a younger individual with limited education, with no past relevant work, who: (a) can lift and carry no more than 50 pounds occasionally and 25 pounds frequently, (b) can be on his feet standing and walking six hours in an eight-hour work day with normal rest periods, (c) can sit about six hours with normal rest periods, (d) is unable to understand, remember and carry out detailed and complex job tasks, (e) "is limited to simple and routine work, not impacted by fast pace, but activity quotas with only minor changes in the work setting," (f) can have only casual interaction with the general public, and is more suited for work dealing with things as opposed to people, and (g) is able to respond appropriately during training sessions regarding simple and routine job tasks (R. 97-98). The VE gave examples of available work for such an individual as a dishwasher, a janitor or a stock person (R. 98-99). The on-task time for these jobs is 90 percent, and no more than one day per month of absenteeism would be tolerated (R. 99). The VE stated that Dr. Lee's restrictions of being absent from work three times per month and being off task 21 percent or more of the time would mean no work would be available for Mr. Yancey (R. 100, 655-57).

## IV.

In his May 20, 2015 opinion, the ALJ followed the familiar five-step process for determining disability. At Step One, the ALJ found that Mr. Yancey had not engaged in

substantial gainful activity ("SGA") since November 21, 2012, the application date (R. 17). Mr. Yancey had worked after the application date; however, the work he performed did not rise to the level of SGA (*Id.*). At Step Two, the ALJ found that Mr. Yancey's anxiety disorder and status-post gunshot wound were severe impairments (*Id.*). The ALJ found that Mr. Yancey's asthma and drug use were not severe (R. 17-18).

At Step Three, the ALJ determined that Mr. Yancey's impairments, alone or in combination, did not meet or medically equal the severity of a Listing, particularly listing 12.06 for anxiety-related disorder (R. 18). The ALJ concluded the "paragraph B" criteria were not satisfied because Mr. Yancey's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration (R. 18-20). The ALJ found Mr. Yancey had a mild restriction in his activities of daily living, relying on the State agency mental health consultants' opinion and the opinion of Dr. Lee (R. 19). The ALJ noted, for example, that Mr. Yancey had a driver's license, was able to perform some chores, took a 60-minute trip on public transportation to arrive at an appointment, and was able to pay bills, count change, handle a savings account and use a checkbook (*Id.*).

In social functioning, the ALJ found that Mr. Yancey had moderate difficulties but that these limitations were adequately accommodated with the mental RFC that he assessed (R. 19). The ALJ relied on the opinions of Dr. Karri and Dr. Fine, who found that Mr. Yancey was cooperative and had a good attitude (*Id.*). The ALJ noted that Dr. Fine had concluded that Mr. Yancey's behavior was appropriate, his mood was even with little range, and his affect was appropriate to content (*Id.*). The ALJ also took into account Dr. Lee's treatment records reporting Mr. Yancey's anger at his mother and kicking and breaking a door in her home, his

denial of thoughts of harming her, and his mother's testimony that she had a restraining order against Mr. Yancey (*Id.*).

The ALJ found Mr. Yancey was moderately limited in concentration, persistence or pace, but that these limitations were adequately accommodated with the mental RFC that he assessed (R. 19-20). The ALJ relied on Dr. Karri's finding that Mr. Yancey was oriented in all three spheres and that his overall effort and cooperation were excellent (R. 19). However, the ALJ also noted that the medical evidence showed increased anxiety and a post-traumatic stress disorder diagnosis stemming from a gunshot wound Mr. Yancey received from police, and that Mr. Yancey reported experiencing auditory hallucinations and difficulties with concentrating and focusing (*Id.*). Additionally, the ALJ noted that Dr. Fine's mental status examination showed Mr. Yancey had an immediate memory deficit, a poor fund of information, and problems with calculations and abstractions (R. 19-20). The ALJ also stated, however, that Mr. Yancey's post-traumatic stress disorder symptoms appeared to have a good response to medication (R. 20).

Finally, the ALJ found that Mr. Yancey experienced no episodes of decompensation which were of extended duration (R. 20). During the relevant time period, the ALJ noted that Mr. Yancey "did not have exacerbations or temporary increases in his symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace three times within one year, or an average of once every four months, each lasting for at least two weeks" (*Id.*). Thus the ALJ concluded that because Mr. Yancey's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied (R. 20). The ALJ also considered the "paragraph C" criteria and determined

there was no evidence to support a finding that his history of post-traumatic stress disorder resulted in a complete inability to function independently outside his home (*Id.*).

Next, after "careful consideration of the entire record" and considering the claimant's symptoms and the extent to which they could be reasonably accepted as consistent with the medical and other evidence and considering the opinion evidence, the ALJ found that Mr. Yancey had the RFC to "perform medium work … except that the claimant is unable to understand, remember, or carry out detailed and complex job tasks" (R. 20). Additionally, he was limited to simple and routine work not impacted by fast-paced productivity quotas with only minor changes in the work setting, he could only have casual interaction with the general public, he was suited for work dealing with things as opposed to people, but he would be able to respond appropriately during training sessions regarding simple and routine job tasks for a training period not to exceed thirty days (R. 20-21). The ALJ followed the two-step process of first determining whether there is an underlying medically determinable physical or mental impairment(s) and, if so, then evaluating the intensity, persistence and limiting effects of the symptoms to determine the extent to which they limit functioning (R. 21).

The ALJ opined that Mr. Yancey's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements regarding the intensity, persistence and limiting effects of the symptoms were not entirely credible (R. 24). In reaching this conclusion, the ALJ reviewed Mr. Yancey's and Ms. Perez's hearing testimony (R. 21-22). He also reviewed the medical evidence in the record, and concluded that Mr. Yancey's physical and mental impairments would not prevent him from working at the medium exertional level with mental limitations (R. 22). The ALJ discussed Mr. Yancey's status post-gunshot wound including his hospitalizations (*Id.*). However, the ALJ noted that he had no weakness, balance

issues, or falls; his musculoskeletal examination showed normal range of motion and no edema and no neurological deficits (*Id.*). Furthermore, the ALJ discussed and relied upon the consultative examination report of Dr. Kari that Mr. Yancey was capable of work at the medium exertional level (R. 22-23).

The ALJ extensively reviewed Mr. Yancey's mental impairment and thoroughly summarized the assessments and medical records created by Dr. Lee and therapist Dr. King, and Dr. Fine's consultative psychiatric examination (R. 23-25). The ALJ gave "limited" weight to Dr. Lee's opinion because it was not supported by his treatment records (R. 25).[10] The ALJ noted that Dr. Lee's most recent treatment records showed Mr. Yancey's symptoms improved with medication, which Dr. Lee omitted from his medical source statement (*Id.*). Additionally, the ALJ stated that Mr. Yancey's longitudinal medical evidence showed his symptoms became worse when he was off his medications (*Id.*). Finally, the ALJ noted that Mr. Yancey reported sleeping and feeling better (*Id.*).

The ALJ afforded "good" weight to the State agency mental health consultant's assessment of Mr. Yancey's mental RFC because it was "consistent with the longitudinal medical record" (R. 26). The ALJ concluded that the RFC was supported by the "lack of objective evidence to support greater limitation, the lack of longitudinal treatment history, good response to routine and conservative treatment and wide ranging daily activities suggesting greater functional capacity" (*Id.*). The ALJ also found that due to Mr. Yancey's status post-gunshot wound, he is limited to work at the medium exertional level and relied on Dr. Kari's finding that Mr. Yancey had mildly decreased range of motion in the hip and walks with a minor limp (*Id.*).

---

[10] The ALJ does not indicate if he is referring to Dr. Lee's August 22, 2013 opinion or Dr. Lee's March 24, 2015 opinion.

At Step Four, Mr. Yancey had no relevant past work (R. 26). At Step Five, the ALJ found that there are a significant number of jobs in the national economy that Mr. Yancey could perform including dishwasher, janitor, and stocker (R. 27). Therefore, the ALJ found Mr. Yancey "not disabled" (*Id.*).

## V.

We review the ALJs decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJs decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Plaintiff argues that remand is necessary because: (1) the ALJ did not properly weigh Dr. Lee's treating source opinions; (2) the ALJ did not properly evaluate Mr. Yancey's RFC; and (3) the ALJ did not properly assess Mr. Yancey's symptom-related limitations (doc. # 14: Pl.'s Mem. at 5-15). We remand based on Plaintiff's first argument that the ALJ did not properly weigh Dr. Lee's treating source opinion; we therefore do not address Plaintiff's other challenges to the ALJ's decision.

## A.

Mr. Yancey argues that the ALJ did not properly weigh Dr. Lee's treating source opinion (Pl.'s Mem. at 5). A treating physician's medical opinion is entitled to controlling weight in the disability analysis if it is "well supported by objective medical evidence and consistent with

other substantial evidence in the record." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016) *quoting Roddy v. Astrue*, 705 F. 3d 631, 636 (7th Cir. 2013). The agency's regulations shed light on how the ALJ should approach the question of the weight to be given to a doctor's opinion. "They state that more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, (5) offered opinions that are consistent with objective medical evidence and the record as a whole." *Roddy*, 705 F.3d at 637 *citing* 20 C.F.R. § 404.1527(c)(2)(i), (ii).

Here, after analyzing the medical findings, treatment records, and medical source statements of Mr. Yancey's treating physician, Dr. Lee, the ALJ afforded "limited" weight to Dr. Lee's opinion "because it [was] not supported by his treatment records" (R. 25). In so doing, the ALJ did not mention that Dr. Lee is a psychiatrist; did not discuss the frequency, or lack thereof, of Mr. Yancey's treatment by Dr. Lee (who saw Mr. Yancey 10 times during the 27-monthperiod from October 2012 to January 2015); and he did not discuss whether Dr. Lee performed the appropriate diagnostic tests on Mr. Yancey. The ALJ also failed to consider the consistency of Dr. Lee's opinion with the opinions of other treating, examining and reviewing medical sources. Although the ALJ discussed the weight to afford the state agency and mental health consultants' opinions, "he did not specify how or to what extent he considered these opinions when deciding to assign little weight to [Dr. Lee's] opinions." *See Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018). Indeed, it is unclear from the ALJ's decision whether he considered the Mental Impairment Questionnaire, dated August 22, 2013, the one dated March 24, 2015, or both in deciding to afford only "limited" weight to Dr. Lee's "opinion" (R. 25).

In support of his conclusion, the ALJ pointed out that most recently, Mr. Yancey reported sleeping and feeling better, and that Dr. Lee's most recent treatment records showed that Mr. Yancey's "symptoms had improved with medication, which Dr. Lee omit[ted] from his medical source statement" (R. 25). However, the ALJ failed to explain how the general statement that Mr. Yancey was sleeping and feeling "better" showed that he did not suffer from the extent of the limitations he claimed. And, the ALJ was incorrect about Dr. Lee's statement: his second Mental Impairment Questionnaire, dated March 24, 2015, stated that Mr. Yancey had only a "partial response to medications" (R. 655). While the ALJ stated that the longitudinal medical evidence also showed that Mr. Yancey's "symptoms became worse when he was not taking his medications" (R. 25), the ALJ did not specifically address Mr. Yancey's explanation that the reason for this was a lack of funds.

The ALJ gave "good weight" to the state agency reviewing psychologists who concluded Mr. Yancey could perform a range of light work because their assessment of Mr. Yancey's mental RFC was consistent with the longitudinal medical record (R. 26, 108-09, 111-13, 122-23, 125-27). The ALJ discussed their opinions that Mr. Yancey's anxiety disorders caused mild restrictions in daily activities, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and no episodes of decompensation (R. 26). The ALJ also noted that the consultative examiners opined that Mr. Yancey had the ability to complete routine, repetitive tasks, and that his ongoing symptoms may reduce his efficiency and stress tolerance, but he was able to engage in work within an average schedule and work week (*Id.*).

An ALJ may not discount the opinion of a treater simply because agency doctors reach a different opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (finding an ALJ must offer "good reasons" for discounting the opinion of a treating doctor). The ALJ must explain *why* the

treater's opinion is not well supported by, or is inconsistent, with other substantial evidence of record. Here, the explanations offered by the ALJ discussed above do not support the limited weight he gave to Dr. Lee's opinion. "An inadequate evaluation of a treating physician's opinion requires remand." *Cullinan v. Berryhill*, 878 F. 3d 598, 605 (7th Cir. 2017).

## B.

In remanding, we do not foreclose the ALJ from deciding that Mr. Yancey is not disabled. We have little question that Mr. Yancey is a troubled young man with anger about his shooting, and in connection with his relationship with his mother. However, there is evidence in the record that raises questions concerning whether Mr. Yancey suffers from the degree of limitations he asserts.

For example, Dr. King noted that Mr. Yancey had no desire to work and instead sought to receive compensation for his shooting or SSI disability (R. 446, 447). This evidence of a desire for secondary gain, which the ALJ did not address, is fair game for an ALJ to consider in deciding the question of disability. *See, e.g., Mason v. Colvin,* No. 13 C 156, 2014 WL 5543896, at *7 (N.D. Ill. Nov. 3, 2014).

In a related vein, the ALJ did not address the frequent recommendations of Drs. Lee and King in 2012 and 2013 for Mr. Yancey to participate in job training (R. 448, 452, 453, 455, 457) – which he failed to do. Nor did the ALJ address the reasons for Dr. Lee making that recommendation at the January 24, 2013 visit; not including that recommendation in his notes of the February 28, 2013 visit; and then -- after not seeing him for nearly six months thereafter -- opining in the August 22, 2013 questionnaire that Mr. Yancey had severe restrictions that would render him unable to work.

The ALJ also failed to address the inconsistency in the testimony as to the reasons for Mr. Yancey's non-compliance with medications that the records show helped alleviate his symptoms. Mr. Yancey testified that he did not have the money for medications at certain times (R. 65), which would be an explanation for non-compliance with medication that is consistent with disability. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). However, that explanation was called into question by Mr. Yancey's mother, who testified that although she pays for his medication she did not believe he regularly took it (R. 93). That kind of non-compliance with prescribed medication that works is relevant to the disability analysis. *Shauger*, 675 F.3d at 696.

We note that Dr. Lee's August 2013 and March 2015 opinions need not rise or fall together. If the ALJ were to conclude that the earlier opinion was entitled to little weight, and to properly support that conclusion, the ALJ still must view the subsequent events that took place in assessing the weight that should be given to the later opinion. As we pointed out above, one of the shortcomings in the ALJ's opinion was his failure to separately discuss these two opinions. We trust the ALJ will address that shortcoming – and others we have identified – on remand.

Finally, in identifying these points, we do not suggest they require any particular outcome on remand. That is for the ALJ to decide – and then, to *explain* what significance he ascribes to the evidence he considered in reaching that decision. We must consider the opinion the ALJ actually wrote, and not one that he might have written. *Mowatt v. Colvin*, No. 15 C 5521, 2016 WL 3951626, at *7 (N.D. Ill. July 21, 2016).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 13) is granted, and the Commissioner's request for affirmation of the ALJ's decision (doc. # 21) is denied. We remand the case for further proceedings consistent with this opinion.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED: March 12, 2018